RANDALL (AUDENREID v.). See Case No. 644.

---

## Case No. 11,553.

### RANDALL v. JAQUES et al.

[4 Quart. Law J. 218.]

District Court, W. D. Virginia. 1857.

EQUITY—DEED—TRUST—ALIEN—ESCHEAT.

1. A private act of assembly construed: It did not confer a mere power, which dies with the person, beyond remedy even in a court of equity, but clothed with a trust, the execution of which, on the death or default of the trustee, a court of equity is competent to enforce, by the substitution of another.

2. In a suit brought for that purpose in the proper court in the county where the trust land lay, the court having entertained jurisdiction, its decree, though all the parties in interest may not have been duly convened, is so far conclusive that its validity cannot be collaterally questioned in another tribunal.

3. A deed executed by an attorney in fact, although he be duly authorized, and although also it be manifest on the face of the deed, that it was the intention of the grantor to execute the power, by conveying the title of the principal, yet will not be the deed of the principal, unless the attorney shall either sign the name of the principal, with a seal annexed, stating it to be done as attorney for the principal, or sign his own name with a seal annexed, stating it to be for the principal.

4. The title to land having under a special act of assembly been held in trust by an unnaturalized alien, upon his death in 1842, his next of kin being also all unnaturalized aliens, it was subject to escheat; but the commonwealth not consummating her title by inquest and office found, and a decree of a competent court of equity in a suit brought for the purpose by the next of kin of the deceased trustee, though it directed a conveyance by a commissioner only of the title of such next of kin, yet having appointed a new trustee and in terms vested in him the title of which the former trustee died seized, is valid for the latter purpose, and vested said title by its direct operation.

5. A deed, though void as an executed contract at law, yet held to be valid as an executory contract in equity; and being otherwise a sufficient foundation for a bill for specific performance, held further, that equity will allow a bill for foreclosure, brought on said deed on the hypothesis that it was valid as a mortgage, and to which a demurrer must otherwise be sustained, to be converted, by amendment, into a bill for specific performance.

6. Vendor of land retaining title as security, his action, or that of the assignee, to subject the land in equity to the satisfaction of the purchase money, can not be defeated by the operation of the statute of limitations, whether the objection arises on demurrer or by plea.

7. Upon a contract to pay a sum certain in an indefinite quantity of cattle and horses, after the day of payment, an action of debt lies, and not merely an action sounding in damages.

In equity.

BROCKENBROUGH, District Judge. The complainant, a citizen of the state of Pennsylvania, has filed his bill on the equity side of this court to foreclose a mortgage executed on the 3d day of November, 1840. The principal defendants, N. J. Wyeth, C. J. Wyeth and Helen Wyeth, without answering, demurred generally to the bill, assigning several special grounds of demurrer. The proper solution of the questions arising on the demurrer requires a full statement of the material facts on which the complainant grounds his demand for a decree of foreclosure. Those facts as detailed in the bill, and modified by the exhibits, must be assumed to be true, since the demurrer in equity, as well as at law, admits the truth of all facts alleged in the adverse pleading, which are sufficiently pleaded; and assuming them to be true, to this extent, denies their sufficiency in law, or equity, to entitle the adversary to the relief he seeks.

On the 30th day of December, 1795, a patent was issued by the state of Virginia to Thomas Wilson for sixty thousand acres of land, situated on the waters of Buckingham river, in Randolph county, in said state. On the first day of January, 1796, the patentee, Wilson, sold and conveyed the entire tract, covered by the patent, to one James Swan, then a citizen of Massachusetts. Some thirty years, or more, before the institution of this suit, the said James Swan established his residence in the city of Paris, in France, and resided there until his death, which occurred prior to the year 1838. During his residence, he contracted many debts and died there, largely indebted to the government of France, and to many of her citizens. While he resided in France, his lands acquired by his purchase from Thomas Wilson became forfeited to the commonwealth of Virginia, for the non-payment of the taxes due thereon. In the winter of 1838, the French creditors of the said James Swan, applied to the legislature of Virginia for relief against the forfeiture of the lands of Swan to the state; and the legislature on the 15th day of March, 1838, passed an act transferring to John Peter Dumas, of France, in trust for the use and benefit of the creditors of Swan, all the right, title and interest of the commonwealth, or of the President and Directors of the Literary Fund, to any lands owned by the said Swan, giving to the said Dumas, or to his legally constituted attorney in fact, authority to sell the lands. The title of these lands having become vested in the President and Directors of the Literary Fund, prior to the passage of the special act of the legislature above referred to, the effect of the act was to transfer the legal title to the lands to the said Dumas, to be held by him in trust, for the use, and benefit, of the creditors of Swan, and to be disposed of, for the purpose of applying the proceeds to the discharge of their claims. By virtue of the provisions of this act of the legislature, John Peter Dumas constituted Antonio F. Picquet of Bristol, in the state of Pennsylvania, his attorney in fact, to sell and convey said lands. On the 3d day of November, 1840, Picquet, as attorney in fact for Dumas, sold and conveyed the tract of land in question, to one David Jacques, a citizen of Virginia, residing in Harrison county, and within the jurisdiction of this court, for the sum of $12,000, payable in cattle or horses, in ten annual payments thereafter, with interest on the last five payments. To secure the payment of the said purchase money, Jacques made to Picquet his promissory note for the said sum of money, payable as above specified in cattle or horses, on the 3d day of November, 1840; and on the same day executed a mortgage deed, in favor of Picquet, to secure the payment of the purchase money. These deeds and note, are filed as exhibits with the bill. The deeds were recorded in the clerk's office of Harrison county, but were not recorded in Randolph county, where the lands were situated. Some time after the purchase, David Jacques sold and conveyed a portion of the said tract to Samuel W. Powell, a citizen of Maryland, who knew that the purchase money was unpaid; and Powell conveyed the land so purchased by him to the Wyeths, citizens of New York. The whole purchase money for the land, sold by Picquet to Jacques, is in arrear and unpaid. Picquet died a few years ago, in Pennsylvania, and the county court of Harrison county, Virginia, appointed Abia Minor, (a citizen of Virginia, and sheriff of Harrison county,) administrator of said Picquet. The said administrator declined to institute any proceedings at law or equity, to collect the debt due from Jacques. Picquet left only one heir at law, his niece, Agusta C. M. A. Picquet, who intermarried with Francis Eugene Puget; both natives and residents of France.

John Peter Dumas died in Paris in 1842, leaving children and heirs residing there; and after the death of their father, Emile Dumas, and Charles Dumas, two of his children and heirs at law, exhibited their bill on the equity side of the circuit court of Kanawha county, Virginia, against the heirs of Picquet and others, praying to have a trustee appointed in place of John Peter Dumas; and on the first day of June, 1855, that court rendered a decree in said cause, appointing the complainant, Josiah Randall, trustee in the place of John Peter Dumas, deceased, with all the powers and authority which had been vested

in the said Dumas by the special act of the legislature of Virginia above cited.

Although the promissory note, made by David Jacques, was payable to Antonio F. Picquet, in his individual character, yet the equitable title to the sum of money therein specified, is vested in the creditors of the said James Swan, and should be applied to the payment of their debts; the legal representative of Picquet having no interest therein; and the complainant here insists, that as trustee for the creditors of Swan, (the parties beneficially interested,) he has a right to invoke the aid of a court of equity to render a decree of foreclosure, directing the mortgaged subject to be sold for the satisfaction of the purchase money, the mortgagor, Jacques, being unable to pay the same. David Jacques, the purchaser and mortgagor of the land, his vendee, S. W. Powell, N. J. Wyeth, C. J. Wyeth, and Helen Wyeth, the vendees of said Powell, the children and heirs of John Peter Dumas, and the personal representative and heirs at law of A. F. Picquet, are made defendants to the bill, which prays a decree for the sale of the mortgaged premises, and for general relief. The defendant Jacques has answered, admitting all the allegations of the bill; and the personal representative of Picquet disclaims all knowledge of the matters alleged in the bill, and therefore neither admits or denies them. None of the other defendants have answered the bill. The original patent from the commonwealth to Thomas Wilson; the deed from Wilson to James Swan; the power of attorney from J. P. Dumas to A. F. Picquet; a transcript of the record of the case decided by the Kanawha circuit court, the conveyance and reconveyance and promissory note, executed on the 3d day of November, 1840, between Jacques and Picquet, and the special act of the legislature of Virginia, are all filed as exhibits with the complainant's bill.

Various questions arise upon the demurrer, and they have been ably and zealously discussed in the argument at the bar. They will be severally considered. The validity of the proceedings of the circuit court of Kanawha, resulting in a decree constituting Josiah Randall trustee in lieu and stead of John Peter Dumas, deceased, is impeached by the demurrants. They insist, through their counsel, that the state court exercised an usurped jurisdiction; that its proceedings cannot affect the demurrants, who were no parties to the cause, and that the decree is a simple nullity. This objection, if well taken, destroys the foundation of the complainant's demand for the relief prayed in this bill, since he has no other authority or right to be entertained here, than that which he derives from the decree of the Kanawha court.

The general question of the power of a court of equity to substitute one trustee for another, and the extent of that power, need not here be discussed. It is one of the most familiar doctrines of equity tribunals, that a trust shall never fail for want of a trustee to execute it; and in every case where the execution of it is obstructed by the death, or incapacity, or unfaithfulness of a trustee, equity beneficently exerts its authority to remove the impediment, by the appointment of a suitable trustee. This large jurisdiction of equity, in cases of trust, is admitted by the counsel for the demurrants; but it is insisted that the act of assembly of the 15th of March, 1838, did not clothe J. P. Dumas with a trust, in the proper sense of that term, but conferred upon him a mere naked power, which died with the person, beyond the capacity of revival, even by the extensive power of a court of equity; that no authority short of the legislative department, could revive this unexecuted and extinct power. The difference between a trustee and a mere agent is well established; the first is clothed with the legal estate, the latter is not vested with any estate whatever; the first has an interest coupled with a power; the latter a power uncoupled with any interest. Now if the state, by its legislative action in the case at bar, constituted John Peter Dumas her agent, merely, with authority to distribute her bounty among certain beneficiaries, retaining her estate in the lands which had vested in her by the forfeiture for the non-payment of taxes, that agent had a mere power and his death worked a revocation of it, and no authority short of the sovereign power which had originally delegated it, could reanimate it. But if the legislative action constituted Dumas a trustee, it invested him with not only a power or authority, but with the complete legal title to the estate, which descended at his death to his heirs at law; and even if he died without heirs, (as he most probably did. being an unnaturalized foreigner, and leaving no descendants, as we may suppose, who were citizens,) though the legal estate would have escheated to the commonwealth, she would doubtless have held it subject to the trust, and not relieved of it. 1 Tuck. Bl. Comm. 65. To determine the just construction of the act of assembly in the case at bar, we must critically scan its language. After reciting the fact, that James Swan had died leaving large tracts of land in Virginia which had become forfeited to the commonwealth for the non-payment of taxes, and other facts not material to be stated here, the preamble of the act reads as follows: "And, whereas, it is represented to the general assembly that the debts of said estate are chiefly due to officers of the French army, who were in the American service during our revolutionary struggle, or the descendants of such officers, and originated in France after that period, by loans, and advances,—made under the promptings of a generous regard for an American citizen, and fellow-soldier; and, whereas, the heirs of James Swan, impressed with the obligation of their ancestor to the said creditors, released to them all their interest in said estate, and the said creditors in order to

realize some portion of the amount due thereon, have placed the subject in the hands of John Peter Dumas, whose agent now here, believing the interest of said creditors will be consulted by abandoning the lands aforesaid, if the taxes and damages thereon shall be exacted for their redemption, appeals to the liberality of the General Assembly for their remission." The act itself then proceeds as follows: "Be it therefore enacted, that all the right, title and interest of the commonwealth, or of the President and Directors of the Literary Fund, to, any of the lands owned by James Swan, under title legal or equitable, lying west of the Allegheny mountains, and which have been forfeited to the commonwealth, or said Literary Fund, for the nonpayment of taxes due thereon, or for failing to enter the same on the books of the commissioner of the revenue, and having the same charged with all taxes chargeable thereon, and paying the same with damages, as prescribed by law, shall be, and the same is hereby transferred to and vested, except as hereafter excepted, in John Peter Dumas, in trust, for the use and benefit of the creditors of James Swan, discharged from all taxes, and damages charged, or chargeable, thereon, before the first day of January, 1838. Be it further enacted, that the said John Peter Dumas shall be authorized to hold said land for the use and benefit aforesaid, and that any sale made by him or his legally constituted attorney in fact, of any part or parcel thereof, shall be valid and sufficient to convey the title with which he is hereby invested; Provided however, that nothing in this, or the preceding section shall in any wise affect the right or title of any bona fide occupant, whose rights are secured by any pre-existing law."

The language employed both in the preamble and act, is strong and explicit. The reasons assigned for the exercise of this unusual liberality of the legislature, are in a high degree creditable to that body; and it would be strange if the courts, in the interpretation of the act, would mar its moral beauty by narrowing its bounty within the limits demanded by the demurrants. When this appeal was made to the liberality of the legislature, a complete title to the lands, once granted by the state, had revested in her, and she generously responded to the appeal made to her magnanimity, by declaring that all her right, title and interest, in the lands in question, should be transferred to, and vested in, John Peter Dumas, for the uses and trust expressed in the act. No language could possibly be clearer to express her intention to divest herself of all claim or title to the lands, and to vest it in J. P. Dumas for the purpose specified. The estate therefore previously vested in her, was by that declaration of legislative will, transferred to, and vested in Dumas, who thus became a trustee, subject to the control and supervision of the courts of equity in the administration of the trust. The fact that the trust here was created by a sovereign and not by a citizen, does not at all affect the question. The equitable jurisdiction attaches whenever the relation of trustee, and cestui que trust, is created, either by public or private act; for fidelity in the administration of a public charity emanating from the state, is precisely as important, to the cestui que trust, nor more, nor less, as it is in one created by individual liberty. Nor are these views impugned by the case of Callis v. Ridout, 7 Gill & J. 1. In that case the powers and duty of a court of equity to appoint a trustee, in any of the contingencies we have referred to, was broadly affirmed by the court, but the application of it to that particular case, under its peculiar circumstances, was denied. The manner in which the commissioners should execute the trust in that case and fill vacancies occurring in their body, was specially pointed out in the act of assembly; and the appellate court held, that the chancellor below erred in removing the commissioners named in the act, and appointing a trustee in their place. It is enough to say that no special circumstances exist in the case at bar. Having thus seen that the act of assembly, which has been cited, created a clear trust and that in the event, which occurred, of the death of the trustee, it was competent for a court of equity to appoint another trustee to execute the trust, we are next to inquire whether the circuit court of Kanawha could rightfully exercise jurisdiction for this purpose. The plaintiffs in that case were two of the sons and heirs at law of John Peter Dumas, and the defendants, were the other co-heirs of the same ancestor, the French creditors of James Swan, and the heirs, and personal representative of A. F. Picquet. None of the parties, plaintiffs or defendants, resided in Virginia, but a portion of the Swan lands, the title to which had been vested in John Peter Dumas as trustee, by operation of the act of assembly, were located in the county of Kanawha: and this fact is recited in the proceedings in the cause, as the foundation of the jurisdiction exercised by the chancellor. The demurrants insist that they should not be affected by a decree to which they were not parties; but as the state court had clear jurisdiction in the cause, the commission to make the demurrants parties in the suit was an error (if an error at all—and I do not intend to intimate an opinion that all the proper parties were not convened before that court.) which this court cannot collaterally enquire into. "Where a court has jurisdiction, it has a right to decide every question which occurs in the case, and whether its decision be correct, or otherwise, its judgment, until reversed, is regarded as binding in every other court; but if it act without authority, its judgments and orders are nullities." Williamson v. Berry, 8 How. [49 U. S.] 541; Id., 17 Curt. Dec. 681; Baylor's Lessee v. Dejarnette, 13 Grat. 173. This court must therefore hold that the appointment of the complainant here

as trustee in lieu of John Peter Dumas deceased, by the circuit court of Kanawha county, was regular and valid.

I am next to consider the effect and operation of the transactions of the 3d of November, 1840, between A. F. Picquet and David Jacques. These consist, first, of a deed from Picquet to Jacques, purporting to convey the tract of 60,000 acres in fee simple, in virtue of a power of attorney executed by John Peter Dumas to A. F. Picquet, constituting him his attorney with power to sell and convey the said lands; 2d, of a deed from Jacques to Picquet, called in the instrument itself, a mortgage deed, and purporting to have been made to secure the purchase money for the land according to the tenor and effect of the contract between the parties, as expressed in the note given by Jacques for the purchase money; which note is described in this deed, as a bond or writing obligatory, but is in fact an unsealed promissory note; 3d, of the last mentioned note, by which Jacques promises to pay to Picquet $12,000, in ten annual payments, in horses and cattle. Several important questions arise on this branch of the case, and they will be severally considered.

The deed from Picquet to Jacques, describes the former as agent for John Peter Dumas, but the conveyance itself, and all the covenants thereof, are in the name of the agent Picquet, and the deed is signed and sealed by A. F. Picquet, without the usual addition of the words, "attorney in fact," for J. P. Dumas, or any equivalent words. The legal title to the land cannot pass from him who has it but by his deed; such deed may be executed either by himself directly, or, by his attorney, duly authorized for that purpose. But it must be so executed as to be the deed of the principal. It is not sufficient, therefore, that it shall be executed by the person who was authorized to make it; but it must be done by him as attorney. For this purpose, it is necessary that the attorney shall either sign the name of the principal, with a seal annexed, stating it to be done as attorney for the principal; or, he may sign his own name, with a seal annexed, stating it to be done for the principal. In either of these forms, the deed becomes the deed of the principal, and if everything else be correct, it conveys the title of the principal. But if the deed be signed and sealed by the attorney, neither in the name of the principal, nor in his own name as attorney for the principal, it is not the deed of the principal. This was decided as early as the 6th year of the reign of Queen Elizabeth (Moore 70), and has been uniformly recognized ever since. Martin v. Flowers, 8 Leigh, 161, 162; Clarke v. Courtney, 5 Pet. [30 U. S.] 349. The case of Martin v. Flowers, is precisely identical with the case at bar, and is not affected by the subsequent cases of Shanks v. Lancaster, 5 Grat. 110, and Bryan v. Stump, 8 Grat. 241, in both of which latter cases the deed executed by the attorney in fact, was held to be the deed of the principal. The authority of Martin v. Flowers, therefore, is quite decisive of the point here. The inconvenience resulting from the rule of the common law, that a deed signed and sealed by the attorney only in his individual name, is not the deed of the principal, though it be manifest on the face of the deed that it was the intention of the grantor to execute the power by conveying the title of the principal, has led to an abrogation of the rule in Virginia, but the act of assembly annulling it, is more recent than the deed we are now considering. Code Va. 1849, p. 500, § 3. It is clear, then, that the legal title to this tract of land, did not pass by the deed from Picquet to Jacques, but continued in J. P. Dumas, up to the period of his death. J. P. Dumas was seized of the fee simple in these lands, though no words of inheritance were used in the act of assembly clothing him with the trust, the common law doctrine that words of inheritance were indispensable to the creation of a fee, having been changed in Virginia, by the act of 1785, re-enacted in the Code of Virginia, p. 501, § 8. Then what became of the legal title on the death of J. P. Dumas? It is descended to his heirs at law, it has been conveyed by them to the complainant, under the authority of the circuit court of Kanawha, through the instrumentality of a special commissioner appointed by the court for the purpose of making the conveyance on their behalf, and in their name; as appeared by the record filed as an exhibit here. That deed purports to convey the legal title to Josiah Randall; but I do not suppose that it had any such effect. The next of kin of J. P. Dumas, were all unnaturalized aliens, and though an alien may take real estate by his own act, he cannot do it by act of law, for, the law, qua nihil facit frustra, never casts a title by descent on one who cannot hold it. Jacksons v. Sanders, 2 Leigh, 109. The legal title, therefore, was subject to escheat, but the commonwealth did not consummate her title by inquest and office found, and had she done so I do not doubt that she would have held the legal title subject to, and not relieved of the trust, as I have elsewhere intimated. The legal title according to my view of the subject, was transferred to Josiah Randall, by the direct operation of the decree of the circuit court of Kanawha, which declares that "he is hereby appointed trustee for the creditors aforesaid," (i. e. the creditors of James Swan,) "in the place and stead of John P. Dumas, deceased, and that, as such trustee, he stands seized of all the lands of James Swan, deceased, which were transferred to and vested in said J. P. Dumas by virtue of the act aforesaid, except such portions thereof as may have been sold and conveyed by the said J. P. Dumas in his lifetime in the execution of the trust." The legal title, then, is now vested in Josiah Randall as

fully and effectually to all intents and purposes as it was vested in Dumas by the act of the legislature.

We have seen that the deed from Picquet to Jacques, was inoperative to pass the legal title, and was a mere nullity in law. Will it be so regarded in equity? By no means. Though void as an executed contract at law, it is nevertheless valid as an executory contract in equity. The two instruments from Picquet to Jacques, and e converso, taken together, clearly manifest the intention of the contracting parties to convey by way of deed of bargain and sale on the one hand, and reconvey, by way of mortgage, on the other. The fairness of these transactions is not impeached, and the contract thus entered into is a sufficient foundation for a bill in equity for specific performance by either party, according to their respective rights. But the bill here, being framed upon the hypothesis that the deed from Picquet to Jacques conveyed the legal title, prays for a decree of foreclosure of the mortgage executed by Jacques to Picquet to secure the purchase money. It is clear that this bill cannot be sustained as a bill for foreclosure as the legal title is in the complainant, and he has not tendered a conveyance of it. The case then made by the plaintiff, in its present shape, is not sufficient, in equity, to entitle him to the relief he seeks, and the demurrer must be sustained. But, as there is clear equity on his side, leave will be given him to amend his bill for a foreclosure of a mortgage, by turning it into a bill for specific execution of an executory contract. I think this course is sanctioned by the general course of equity practice, and by the court of appeals of Virginia, who allowed a complainant so to amend his bill as to convert it from a bill praying specific execution of a contract, into a bill for rescission of the same contract. Parrill v. McKinley, 9 Grat. 1. See 1 Daniell, Ch. Prac. 517–519, marginal page.

It was insisted in the argument, by the counsel for the demurrants, that no recovery could be had here, because it appeared upon the face of the complainant's case, that the contract which he seeks to enforce was a mere parol contract, and that it was fully due more than five years before the institution of this suit; that courts of equity, equally with a court of law, applied the statute of limitations; and that where it appeared on demurrer to a bill in equity, that the complainant's demand was such that a plea of the statute of limitations would bar the plaintiff's action at law, the demurrer must be sustained. The general propositions contended for, are sustained by high authority. Story, Eq. Pl. §§ 503, 751. But while it is generally true that the statute of limitations will avail a defendant in equity, as well as at law, it is not universally so. In cases of concurrent jurisdiction, the court of equity applies the statute as rigidly as the court

of law, the maxim equits sequiter legem, being strictly applicable in all such cases. But in cases of pure trusts, cognizable only in equity, the statute has no application. In the case at bar, the legal title was retained in the vendor, whether it was conveyed by the deed from Picquet as agent of Dumas to Jacques or not; if it was so conveyed, it was reconveyed at the same time by Jacques to Picquet, for the benefit of his principal, by his mortgage deed; and these acts being simultaneous, must be regarded as parts of one entire transaction. Seekright v. Moore, 4 Leigh, 30; Wheatley v. Calhoun, 12 Leigh. 264. Upon this hypothesis, though Jacques was seized, he was so for a transitory instant only, and this was equivalent to a retention of the legal title in Dumas. If the deed from Picquet to Jacques did not convey the title at all, as I have held elsewhere in this opinion, then it continued uninterruptedly in Dumas. In either case, therefore, it is now in Josiah Randall as successor of John Peter Dumas. Now where the vendor of land retains the title, as security for the purchase money, his lien upon the land being a partly equitable one, cannot be affected by any lapse of time short of the period sufficient to raise the presumption of payment, whatever might be the operation of the statute of limitations in an action at law brought to recover the purchase money: and even the assignee of a promissory note given for the purchase money of land, the legal title being retained by the vendor, may bring his bill after the lapse of five years, convening the vendor and vendee, and compel specific execution of the contract, in a case proper for such relief, and subject the land to the satisfaction of his claim. Hanna v. Wilson, 3 Grat. 243. Recovery in the case at bar, therefore, which is identical with the case last cited, cannot be defeated by the operation of the statute of limitations, whether the objection arises on demurrer or by plea.

Again it was said there was no valid mortgage here to be foreclosed; that there was no debt arising here out of these contracts, and that debt was of the essence of a mortgage; that the demand of the complainant sounded in damages merely, and that his proper resort was to a court of law to have them assessed. This objection is formed, I apprehend, in a misconception of the true nature of the contract here, which departs from the usual form of money contracts. The vendee stipulates to pay not in money, simply and generally, but a given amount of money, viz: $12,000, in cattle and horses. Now where a sum of money is reserved, payable in an indefinite quantity of a collateral article, it is substantially a money demand, for the debtor is bound by his contract to furnish so much of the collateral article, as at the day of delivery will bring, in the market, the specified sum. If there be a breach of the contract, by a failure to deliver, the

creditor may bring an action of debt for the amount of money specified, without averring the non-delivery, of the, collateral article. By the form of the contract the debtor has acquired the privilege of paying off his debt in a more convenient medium than money, and having waived his privilege, the creditor may treat the claim as if no such privilege had been retained, by the debtor; in other words, may recover the sum of money specified in an ordinary action of debt. But if a specified sum of money is stipulated to be paid in a definite quantity of a collateral article of fluctuating value, then it is clear that no debt, in a legal sense, results, but in case of a breach by the failure to deliver, a jury must be impanneled to inquire of damages, which cannot be ascertained except by a resort to extrinsic evidence. Thus, if a farmer gives his bond or note for the payment of $1,000, by a given day, in one thousand bushels of wheat, and there is a breach, the loss of the creditor is not necessarily $1,000, but more or less, according to the market price of the wheat on the day of the breach, and at the place of delivery. Here, debt will not lie, but assumpsit or covenant only, according to the nature of the contract, the former, if a parol, the latter if it be a sealed contract. These distinctions are very well established by the court of appeals of Virginia, in the cases of Beirne v. Dunlap, 8 Leigh, 514, and Butcher v. Carlile, 12 Grat. 520. The contract here is referable to the first of the classes of cases, and the action of debt would lie upon it.

The last objection as arising on the demurrer, is that the proper parties are not before the court. The French creditors of Swan have not been convened, and as they are the cestui que trusts of the complainant, and no special reason appears why they should not be made parties, I think the objection is well taken.

Demurrer sustained, and leave given to the complainant to amend his bill, and make new parties.